**THOMAS E. HIGGINS, ESQ.**
**LAW OFFICE OF**
**THOMAS E. HIGGINS, P.L.L.C.**
325 West Franklin Street
TUCSON, ARIZONA 85701
(520) 624-8663
Arizona State Bar No. 04324
Attorney for: Roger Dale Godwin

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| **UNITED STATES OF AMERICA,**<br>Plaintiff,<br><br>VS.<br><br>**ROGER DALE GODWIN,**<br><br>Defendant. | CR-17-01620-RCC-1<br><br><br>**SENTENCING MEMORANDUM** |

Defendant, ROGER DALE GODWIN, by and through his undersigned attorney, hereby submits to this Honorable Court his Sentencing Memorandum requesting that this Court impose a sentence of 36 months of imprisonment followed by 36 months of home confinement as to Count 2 of the indictment and 5 years of probation as to Count 1 of the indictment which is consistent with the sentencing range as provided by the United States Sentencing Guidelines, 18 U.S.C. §3553(a) and the plea agreement. This request is fully set forth in the accompanying Memorandum of Points and Authorities.

RESPECTFULLY SUBMITTED this 17th day of December , 2018.

By: /s/Thomas E. Higgins___
THOMAS E. HIGGINS
Attorney for Mr. Godwin

# MEMORANDUM OF POINTS AND AUTHORITIES
STATEMENT OF FACTS

## A. A History of the Defendant's Arrest and Detention.

Roger Dale Godwin was charged in a three count indictment with: Count 1- threats against the President of the United States, Count 2-mailing threatening communications and Count 3-false information and hoaxes for events occurring on June 1, 2016 in the District of Arizona.

On June 28, 2018, Mr. Godwin plead guilty to Count 1 and 2 of the indictment pursuant to a plea agreement. The terms of the plea agreement provide that the parties stipulate to a sentencing range not to exceed 84 months of imprisonment on Count 2 of the indictment to be served consecutive to any other existing or active case followed by 3 years of supervised release. As to Count 1, the parties stipulate that Mr. Godwin will sentenced to a concurrent term of 5 years of probation. However, Mr. Godwin is not precluded from requesting a variance to the stipulated sentencing range. (See, PSR ¶¶ 3, 4).

On June 1, 2016, a corrections officer accepted outgoing mail from Mr. Godwin in the form of four envelopes with the return address on the envelopes identifying Mr. Godwin as the sender with the address of the Special Housing Unit of the U.S. Penitentiary in Tucson, Arizona. The corrections officer noted a white powder coming out of one the envelopes and immediately isolated himself along with two other staff members in the mail room. The FBI, Tucson Police Department Bomb Squad and the Tucson Fire

Department Haz-Mat team were called to the scene as the prison was placed on lock-down status. The letter and the substance within the envelope were field tested with negative results. Subsequently, all the letters were throughly tested with no finding of any chemical, biological agents or hazardous materials.

The letter with the white powder was found to be addressed to then U.S. Attorney General Loretta Lynch in which Mr. Godwin complained he was being harassed and mistreated by Bureau of Prisons ("BOP") staff. Mr. Godwin threatened harm to one staff member if he was not moved to another correctional facility. Mr. Godwin also threatened harm to then President Obama indicating that the letter had exposed them to anthrax.

When interviewed, Mr. Godwin readily admitted he wrote the letters stating that he believed it was a good idea because of the mistreatment he was receiving from BOP staff. (See, PSR ¶¶ 6, 7).

During his presentence interview, Mr. Godwin agreed with the factual basis in the plea agreement. Mr. Godwin expressed he committed these offenses because he was being harassed by a BOP employee and he was not receiving appropriate medical care. Because he was frustrated with the lack of response to his complaints, Mr. Godwin believed that these threats would cause the government to respond to his complaints. (See, PSR ¶ 11).

**B.      ARGUMENT AND RECOMMENDATION:**

Mr. Godwin contends that the pronouncements of the United States Supreme Court in *United States v. Booker,* 125 S.Ct. 738 (2005)*, Kimbrough v. United States,*

128 S.Ct. 558, 169 L.Ed.2d 481 (2007), *Rita v. United States,* 127 S.Ct. 2456 (2007) and *United States v. Gall,* 128 S.Ct. 586, 169 L.Ed.2d 445 (2007), that this Court must consider the sentencing guidelines as advisory in nature and that the Court is free to impose a sentence that is just and fair under the circumstances of the case. District courts after *Booker,* can justify consideration of factors such as family responsibilities, age, education and vocational skills, mental and emotional conditions and employment record.

**1.  Sentencing Factors Pursuant to § 3553 (a):**

Sentencing is now governed by the factors outlined in 18 U.S.C. § 3553 (a). Any District Court has the authority to depart from the Federal Sentencing Guidelines when "an aggravating or mitigating circumstance of any kind, or to a degree, not adequately taken into consideration by the Sentencing Commission" is present in a case before the Court at the time of sentencing. See also 18 U.S.C. § 3553(b); U.S.S.G. § 5K2.0.  This authority allows the court to remain ". . . free to consider [a defendant's] individual circumstances."  See also, *United States v. Estrada-Plata,* 57 F.3d 757, 763 (9th Cir. 1995).

In *United States v. Ministro-Tapia,* 470 F.3d 137 (2nd Cir. 2006), the Second Circuit, ruled that a district court must impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of 18 U.S.C. §3553(a). The Second Circuit unequivocally ruled that "if a district court were

explicitly to conclude that two sentences equally served the statutory purpose of § 3553, it could not, consistent with the parsimony clause, impose the higher" one. In *United States v. Williams,* 475 F.3d 468, 476-477 (2nd Cir. 2007), the Second Circuit stated:

> We have recognized that district courts are to impose sentences pursuant to the requirements of § 3553(a)-including the requirements of § 3553(a)'s parsimony clause-while appellate courts are to review the sentences actually imposed by district courts for reasonableness. *See Ministro-Tapia,* 470 F.3d at 141 (noting "our general agreement with this dichotomy"); *see also United States v. Foreman,* 436 F.3d 638, 644 n. 1 (6th Cir.2006) ("[A] district court's job is not to impose a 'reasonable' sentence. Rather, a district court's mandate is to impose 'a sentence sufficient, but not greater than necessary, to comply with the purposes' of section 3553(a)(2). Reasonableness is the *appellate* standard of review in judging whether a district court has accomplished its task.").

Mr. Godwin acknowledges that he was involved in the criminal activity set forth in the presentence report but urges this Court to sentence of 24 months of imprisonment followed by 36 months of home confinement as to Count 2 of the indictment and 5 years of probation as to Count 1 of the indictment which is consistent with the sentencing range as provided by the United States Sentencing Guidelines, 18 U.S.C. §3553(a) and the plea agreement. Mr. Godwin asks the Court to take into account the following factors:

**2.     The Nature and Circumstances of the Offense:**

As set out in the presentence report, Mr. Godwin was motivated to commit these offenses primarily out of his need to have BOP staff respond to his complaints about

his medical treatment. Mr. Godwin was extremely frustrated that his medical conditions were not properly being addressed and he was upset that his complaints were being ignored or plainly being rejected. (See. PSR ¶¶ 5,6 &11).

Mr. Godwin's misguided calculation to address the problem compounded not only his status within the prison but further exacerbated his own health and mental illness problems.

There is no questions that Mr. Godwin suffers from long term physical and mental issues as documented in the PSR and by the attached Appendix. (See, PSR ¶¶57-90). His health issues have not gotten better since this incident as Mr. Godwin faces more serious medical procedures and treatment in the future.  In fact, as of today, December 17, 2018, Mr. Godwin is both throwing up and defecating blood.

Unfortunately, Mr. Godwin has a long history of mental illness, substance abuse, and criminal conduct that he needs to overcome in order to insure that he will not re-offend or commit any other criminal acts in the future.

There is likely no criminal behavior that represents as much of a challenge for our system of justice than those crimes that are a direct result of one's addiction to drugs or alcohol. The balance between the correct amount of punitive action that should be taken versus the amount of rehabilitative efforts that should be provided has vexed societies for time immemorial. This balance must require that the policy addresses ways that will increase public protection that is based upon research and

evidence. An evidence-based approach ensures that society is able to find that vexing balance between sequestration of the offender while also affording treatment and effective supervision.

The statistics have long shown the difficulties that we as a society face when dealing with drug offenders. The statistics also show that imprisonment has never been a long term solution to treating drug addicts who commit crimes. The following snapshot of a sample of those statistics represent the Roger Dale Godwin's of the population, that is, those people who are mentally ill, addicted to drugs, and are guilty of drug and property crimes.

- Among state prisoners 30% of property offenders and 26% of drug offenders committed their crimes for money. [1]

- Among state prisoners 44% of drug offenders and 39% of property offenders committed their current offense while under the influence. [2]

- Among state prisoners that are mentally ill, 76% are dependent on or abused alcohol or drugs. [3]

- Among inmates in jails, 82% who have a mental illness report having used alcohol or drugs in the month before the offense. [4]

---

[1] BJS, *Drug Use and Dependence, State and Federal Prisoners, 2004*, October 2006.

[2] *Id*.

[3] BJS, *Mental Health Problems of Prison and Jail Inmates*, September 2006.

[4] *Id*.

- Between 1997 and 2004 the rates of drug abuse for all drugs but those classified as amphetamines remained the same. "State prisoner reports of stimulant use went up on all measures. Stimulant use in the month before the offense increased from 9% in 1997 to 12% in 2004, and use at the time of offense rose from 4% to 7%. The increase in the use of stimulants were attributable to the rising use of methamphetamines. [5]

- Despite the universal increase in punitive measures for dangerous drug offenses, "drug offenders made up the same percentage of prisoners in both 1997 and 2004." [6]

- Among drug offenders, 78% had a prior sentence to incarceration or probation. [7]

- Among drug offenders in prisons between 1997 and 2004, those serving time for violations involving amphetamines rose from 10% to 19%. [8]

- Among drug offenders in prisons between 1997 and 2004, the number who had received treatment at any time in their lives decreased from an abysmal 14.6% to 14.1%. [9]

---

[5] BJS, *Drug Use and Dependence, State and Federal Prisoners, 2004*, October 2006.

[6] *Id.*

[7] *Id.*

[8] *Id.*

[9] *Id.*

- Within 5 years of release from prison, 82% of property offenders and 77% of drug offenders were arrested for a new crime.[10]

Despite these facts, access to *effective* treatment is rarely utilized unless the offender can afford to pay for their own inpatient rehabilitation. The Office of National Drug Control Policy reports that only 40% of inmates receive *any* type of treatment while incarcerated. The quality of that treatment varies greatly between the states. This is unfortunate as it is universally accepted that real treatment options for drug offenders, specifically long term inpatient treatment, is extremely efficacious in not only reducing recidivism, but it is also much less expensive than prison. As stated above 82% of property offenders and 77% of drug offenders were arrested for a new crime within 5 years of release from prison. Brooklyn's DTAP program mirrors the successes of similar programs throughout the United States. The program allows drug addicted defendant's to plead guilty and then enter a 15 to 24 month "residential, therapeutic community treatment system as an alternative to a prison sentence." These participants are 67 % less likely to return to prison than groups not receiving such treatment.[11] Mr. Godwin has never had the benefit or privilege of being able to attend any type of meaningful treatment for his drug addiction, much less inpatient treatment.

---

[10] BJS, *Recidivism of Prisoners Released in 30 states in 2005: Patterns from 2005 to 2010*, April 2014.

[11] Justice Policy Institute, *Treatment or Incarceration? National and State Findings on the Efficacy and Cost Savings of Drug Treatment Versus Imprisonment*, January 2004.

### 3. **The History and Characteristics of the Defendant:**

The PSR documents in lengthy form the history and characteristics of Mr. Godwin beginning from his first contacts with the court system, first civilly as he was being adopted by his biological uncle and aunt and continuing through his current contact with the criminal justice system when he was indicted for the present offenses while in custody after recently being convicted of similar federal offenses in the Western District of Wisconsin, Docket No. 3:13-cr-00051-RTR-1. (See, PSR ¶¶ 34-42, 49-64).

Mr. Godwin was born on December 4, 1978 in Temple, Texas, as the only child of the relationship between William Earl Mann and Doris O'Dell. Mr. Godwin never established a relationship with his father and has no idea of his whereabouts. Mr. Godwin's mother lives in Oklahoma and only recently reconnected with him after being separated from Mr. Godwin for most of his life. Mr. Godwin has a maternal half brother, Randy Godwin, age 32, living in Pennsylvania with whom he recently has exchanged some brief correspondence after finding him in April, 2018.

Mr. Godwin's mother was 14 years of age when he was born and she was unable to care for him. As a result, she gave Mr. Godwin up for adoption by her cousin Buddy Godwin and his then wife, Donna Hall. As documented in the PSR, Mr. Godwin alleged that his adoptive parents were physically abusive alcoholics and that he would run away from their house and stay at Joseph and Barbara Jordan's home in

nearby Monroeville, Alabama. The Jordans were Donna Hall's parents.

Eventually, Mr. Godwin's adoptive parents divorced when he was in his early adolescence. It was about this same time that Mr. Godwin began abusing drugs and associating himself with biker and white supremacy gangs. Mr. Godwin was placed into the Alabama State Boy's Ranch by his adoptive father due to him being unable to control Mr. Godwin's behavior. Mr. Godwin remained in this facility for one year and thereafter left in search for his father. Reportedly, Mr. Godwin lived in Texas, Alabama, Mississippi and Louisiana during 2001. In 2002 he moved to Wisconsin where he received his first felony conviction. Mr. Godwin has been in custody almost continuously since then. (See, PSR ¶¶ 50-52).

**4.     The Need for the Sentence To Be Imposed:**

Generally, sentencing guidelines exist a) to reflect the seriousness of the offense, to promote respect for the law and to provide just punishment for the offense; b) to afford adequate deterrence to criminal conduct; c) to protect the public from further crimes of the defendant; and d) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

As provided herein, Mr. Godwin respectfully urges this Honorable Court to find the combination of these factors to support a just sentence of 24 months of imprisonment followed by 36 months of home confinement as to Count 2 of the

indictment and 5 years of probation as to Count 1 of the indictment which is consistent with the sentencing range as provided by the United States Sentencing Guidelines, 18 U.S.C. §3553(a) and the plea agreement.

**C.    Mitigating Factors To Consider Departing Downward or for a Variance**

    **1.    Mr. Godwin's Mental and Emotional Condition**

Pursuant to U.S.S.G. § 5H1.3 and U.S.S.G. § 5K2.0, this Court may depart downward based on mental and emotional conditions, if these conditions, individually or in combination with other characteristics, are present to an unusual degree and distinguish the case from the typical cases covered by the guidelines.  Such an extraordinary mental and emotional condition may be a reason to depart downward; e.g., in the case of a seriously infirm defendant, home detention may be as efficient as, and less costly than, imprisonment.

"Clinical studies confirm that exposure to stress early in life –specifically, to inadequate or abusive parenting – changes in emotional circuitry of the brain and the neuroendocrine mechanisms underlying allostasis [the inherent flexibility that allows functions such as rate and respiration to increase or decrease to counter potentially destabilizing events] in enduring and often compromising ways."  Debra Niehoff, *Ties that Bind: Family Relationships, Biology, and the Law*, 56 DePaul L.Rev. 847, 855, 861. (2007).

Thus, for example in *United States v. Rivera*, 192 F.3d 81, 84 (2d Cir. 1999),

the Second Circuit commented when on a downward departure for child abuse: "It seems beyond question that abuse suffered during childhood – at some level of severity – can impair a person's mental and emotional conditions...in extraordinary circumstances… district courts may properly grant a downward departure on the ground that extreme childhood abuse caused mental and emotional conditions that contributed to the defendant's commission of the offense" but here, defendant "failed to allege and show, as required for a §5H1.3 departure, that any abuse he may have suffered rose to the extraordinary level that can be assumed to cause mental or emotional pathology." *See also, United States v. Pullen*, 89 F.3d 368 (7th Cir. 1996) (in light of *Koon v. U.S.*, 518 U.S. 81 (1996), sentence remanded for determination of whether childhood abuse was extraordinary to enable judge to exercise discretion to depart downward); *United States v. Walter*, 256 F.3d 891 (9th Cir. 2001) (combination of brutal beatings by defendant's father, introduction of drugs and alcohol by his mother, and, most seriously, the sexual abuse by his cousin which defendant suffered at young age constituted the type of extraordinary circumstances justifying consideration of the psychological effects of childhood abuse and diminished mental capacity under §5K2.13; remanding for evidentiary hearing so that defendant can substantiate claims of abuse and expert's conclusions); *United States v. Brown*, 985 F.2d 478 (9th Cir. 1993) (where defendant offered letter recounting severe childhood abuse and neglect and psychologist's report concluded that childhood trauma was

primary cause of his criminal behavior, court could grant downward departure); *United States v. Hubbard*, 369 F. Supp. 2d 146 (D. Mass 2005) (imposing 108 month sentence instead of 188-235 career offender range based on defendant's diminished capacity from childhood trauma including sexual molestation and death of siblings in fire); *United States v. Ayers*, 971 F. Supp. 1197 (N.D. Ill. 1997) (granting departure based upon cruel childhood with relentless physical, sexual and psychological abuse over course of years).

As documented in this sentencing memorandum and the attached appendix, in Mr. Godwin's case, a prison sentence could well be a "death sentence" as the prison facility could not adequately deal with all of his complex and serious medical and mental health issues.

### 2. Mr. Godwin's Reduced Mental Capacity

Pursuant to U.S.S.G. § 5K2.13, this Court may depart downward if Mr. Godwin committed the offense while suffering from a significantly reduced mental capacity and Mr. Godwin's reduced mental capacity contributed substantially to the commission of the offense. See, e.g., *Tennard v. Dretke*, 124 S.Ct. 2562, 2571 (2004) ("impaired intellectual functioning is inherently mitigating"); *Atkins v. Virginia*, 536 U.S. 304, 318 (2002) ("Mentally retarded persons...have diminished capacities to understand and process information, to communicate, to abstract from mistakes and learn from experience, to engage in logical reasoning, to control impulses, and to understand the

reactions of others... often act on impulse rather than pursuant to a premeditated plan, and... are followers rather than leaders. Their deficiencies do not warrant an exemption from criminal sanctions, but they do diminish their personal culpability."); *Penry v. Lynaugh*, 492 U.S. 302, 322 (1989) (O'Connor, J., concurring) ("mental retardation may render a defendant "less morally culpable than defendant who have no such excuse"); *United States v. Alemenas*, 553 F.3d 27 (1st Cir. 2009) (in prosecution for selling crack, judge granted a downward variance of 43 months from an already reduced Guideline range, citing defendant's mental and emotional condition plus his chronic neck pain).

**3.    A Long Sentence Would Impair Mr. Godwin's Rehabilitation**

Any sentence that is longer than necessary can impede rehabilitative goals of incarceration, *See*, *United States  v. Collington*, 461 F.3d 805 (6th Cir. 2006) (in drug/gun case for which guidelines advised 188-235 months, a 120-month sentence was upheld because it sufficiently reflected the seriousness of the offenses while allowing the possibility for defendant to reform and go on to a productive life upon release in his mid-thirties); *United States v. Autrey*, 555 F.3d 864 (9th Cir. 2009) (district court's finding that man convicted of one count of child porn possession would not be adequately accommodated in prison and would be better served by outpatient psychiatric treatment supported reasonableness of imposing five years probation rather than a guideline term of 41-51months); *United States  v. Moreland*,

568 F.Supp.2d 674 (S.D. W.Va. 2008) (after rejecting career offender guideline range of 30 years to life, court imposes statutory mandatory minimum of 120 months for a 34 year old defendant whose educational record reflected a rehabilitative hope the judge decided should not be quashed by a sentence leaving little to hope for beyond imprisonment); *United States v. Stern*, 590 F.Supp.2d 945 (N.D. Ohio, Dec. 19, 2008) (in imposing 12 months and a day on child porn defendant who had never engaged in physical misconduct with an actual child, court observed that lengthier term might negatively impact the rehabilitation Stern commenced prior to his arrest); *United States . v. Pallowick*, 364 F. Supp. 2d 923 (E.D. Wisc. 2005) (defendant convicted of six armed bank robberies sentenced to 46 months, rather than guideline range of 70-87 months, because no one was hurt, defendant made no direct threats, his only prior was a burglary committed shortly before, his severe mental illness of major depressive disorder and anxiety disorder played a major role in the offenses, after arrest he completed in-patient treatment, enrolled in counseling, and took medication, he was not dangerous and unlikely to re-offend, and judge concluded that a lengthier period would not aid rehabilitation but might hinder his progress in counseling, contrary to § 3553(a)(2)(D))

  Finally, without direction or encouragement from defense counsel, Mr. Godwin, on his own, completed drug and alcohol classes as CCA as well as completed a course in cognitive skills.  Numerous occasions, more than counsel can remember, Mr.

Godwin has initiated and followed through with discussions involving drug and alcohol abuse and recognizes his mental, and criminal, behavior is a direct outgrowth of his addictions.

## III.     CONCLUSION:

For the foregoing reasons, Mr. Godwin respectfully requests that this court review the record, the facts and arguments contained in this memorandum, all the exhibits and letter of recommendations and find that substantial mitigating factors have been presented to warrant the imposition of a sentence of 24 months of imprisonment followed by 36 months of home detention under the circumstances of this case.

RESPECTFULLY SUBMITTED this 17th day of December, 2018

/ss/*Thomas E. Higgins*
THOMAS E. HIGGINS
Attorney for Roger Dale Godwin

Original copy of the foregoing mailed this _____ day of December, 2018, to:

Court

AUSA Micah Schmidt

*Law Office of* **THOMAS E. HIGGINS**, 325 W. Franklin Street, Tucson, Arizona 85701